IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MATTHEW T. DOUGHTY,

                    Plaintiff,

     v.                                                    OPINION and ORDER

DR. KARL M. HOFFMANN,[1]                                   23-cv-21-wmc

                    Defendant.

---

Plaintiff Matthew T. Doughty, who represents himself, is currently incarcerated by the Wisconsin Department of Corrections ("DOC") at the New Lisbon Correctional Institution ("NLCI"). The court granted Doughty leave to proceed with claims that the defendant, Dr. Karl M. Hoffmann, denied him adequate medical care for knee pain in violation of the Eighth Amendment and state law. (Dkt. #10.) Defendant has moved for summary judgment on those claims. (Dkt. #28.) For the following reasons, the court will grant that motion as to plaintiff's Eighth Amendment claims and relinquish any supplemental jurisdiction over his remaining state-law claims.

UNDISPUTED FACTS[2]

A. Background

At all times relevant to this case, Doughty was housed at NLCI, where Dr.

---

[1] Defendant's name appears as "Dr. Karl M. Hoffman" on the complaint. Dkt. #1, at 1. Because the summary-judgment evidence reflects that the defendant's surname is "Hoffmann," the court has corrected the spelling for purposes of this opinion.

[2] Unless otherwise indicated, the following facts are undisputed and have been taken from the parties' proposed factual findings, responses, and evidence of record. The entire record has been

Hoffmann worked as a physician from 2015 until his retirement from state service in 2021. In September 2017, Doughty had total left hip replacement surgery at Waupun Memorial Hospital.  Several months after the procedure, Doughty reported pain in his right knee at a follow-up appointment with a physical therapist, who noted a discrepancy in length between Doughty's right and left legs due to his hip replacement surgery.  As a result, the physical therapist provided Doughty with a device or insert to place in his right shoe to compensate for the leg length discrepancy.

In July 2018, Doughty also had an appointment with an offsite specialist at Winkley Orthotics & Prosthetics ("Winkley") to confirm and measure the leg length discrepancy observed by the physical therapist.  The specialist at Winkley confirmed a discrepancy in length between Doughty's right and left legs, with the right leg being the shorter of the two.  The specialist further confirmed that an external lift was needed and provided Doughty with a half-inch heal lift for his right shoe.  Meanwhile, for pain, Doughty had been prescribed acetaminophen and meloxicam -- a non-steroidal, anti-inflammatory ("NSAID").

In October 2018, Doughty returned to Waupun Memorial Hospital for an annual follow-up appointment regarding his total hip replacement.  A specialist, Dr. Eric Nelson, conducted a physical examination during this visit and confirmed that Doughty's hip replacement had healed well.  In particular, Nelson reviewed new imaging, noted that the prosthetic components of Doughty's left hip were in good position, and confirmed there

---

construed in the light most favorable to plaintiff as nonmovant under the summary-judgment standard of review set forth in the opinion below.

were no complications.   While Dr. Nelson also confirmed the discrepancy in length between Doughty's left and right legs, he was untroubled by it and recommended another follow-up appointment in three years to monitor Doughty's hip replacement.[3]

In December 2019, Doughty wrote two, follow-up letters to the Health Services Manager ("HSM") at NLCI.  Doughty explained that as a result of undergoing a total left hip replacement, his left leg was now an inch longer than his right.   Doughty further reported that since undergoing the surgery he had been experiencing constant pain in his back and right knee, which he attributed to this leg-length discrepancy.  In her response to Doughty's letters, the HSM noted that she had not received any previous Health Service Requests ("HSRs") or letters about these complaints, and she summarized the care he had actually received.  Even so, the HSM advised Doughty that she would schedule him to be seen by a medical provider in the next few weeks.

### B.   Plaintiff's Treatment By Dr. Hoffmann

Dr. Hoffmann treated Doughty for the first time on January 15, 2020, noting that he had been experiencing ongoing pain following his hip replacement surgery, which resulted in a leg length discrepancy documented by two offsite specialists.  Dr. Hoffmann also observed that Doughty had received a lift for his right shoe to compensate for this discrepancy.   In response, Doughty reported that while the lift compensated for the

---

[3] Dr. Nelson did not perform the hip replacement surgery.  Plaintiff filed a separate lawsuit against the orthopedic surgeon who performed that surgery, alleging that the leg length discrepancy was the result of a mishandled surgical procedure.  That lawsuit was dismissed on summary judgment in favor of the surgeon.  *See Doughty v. Grossman*, No. 3:19-cv-529-wmc, 2023 WL 2525011 (W.D. Wis. March 15, 2023), *aff'd*, Slip Op. No. 24-1702, 2024 WL 550324 (7th Cir. Feb. 12, 2024).

discrepancy reasonably well, it was extremely rigid and he was experiencing pain in both his right knee and lower back after walking for more than 10 minutes.

During the same appointment on January 15, Dr. Hoffmann conducted a physical examination to rule out potential causes for Doughty's right knee pain (other than the leg-length discrepancy).  Specifically, Dr. Hoffmann examined Doughty's feet to check for intermittent claudication, which refers to muscle pain triggered by sustained activity and relieved by rest.  After ruling out intermittent claudication, Dr. Hoffmann concluded, as apparently had the two specialists, that Doughty's right knee pain was most likely caused by the leg-length discrepancy.

More specifically, in Dr. Hoffmann's opinion, Doughty's left leg being longer than the right and the rigid lift in Doughty's right shoe created an unnatural walking pattern that was putting a strain on Doughty's right knee and the muscles of his right leg.  As part of his treatment plan, Dr. Hoffmann discontinued the meloxicam, which Doughty had said was ineffective to relieve his pain, and prescribed a different anti-inflammatory medication (ibuprofen).  Because Doughty's leg length discrepancy was well documented in his medical charts, however, Dr. Hoffmann did not order new imaging.  Rather, Dr. Hoffmann ordered a physical therapy consultation and lab tests to provide further information on other potential health issues, such as diabetes and high cholesterol.  Finally, Dr. Hoffmann ordered that Doughty return in three months to evaluate whether the new pain medication was helping and to assess the lab results.

For the next three months, Doughty did not submit any HSRs about pain in his right knee.  However, Doughty again complained of right knee and hip pain when he saw

the physical therapist on February 11, 2020.  Shortly thereafter, on February 23, 2020, Doughty also submitted an inmate complaint requesting gel insoles recommended by Dr. Hoffmann at his initial appointment.  In his February complaint, Doughty emphasized that he was dealing with "intense back [and] knee pain" since the hip replacement surgery, which he described as "botched."

On April 15, 2020, Dr. Hoffmann saw Doughty for a follow-up appointment to evaluate how well his new medication was working and the results of his lab tests.  At this appointment, Doughty reported that he had long-term issues with arthritis in his back. Doughty also reported that the new medication he was taking (ibuprofen) was no more effective than his previous medications and was causing stomach issues.  Dr. Hoffmann discontinued the prescription for ibuprofen and ordered "Celebrex," which is another prescription-strength NSAID.  After Doughty complained that the lift in his right shoe was too hard and heavy, Dr. Hoffmann ordered a consultation with an offsite specialist at Winkley, which had created the original lift.  Dr. Hoffmann also ordered a follow-up appointment for Doughty in five months to evaluate the effectiveness of his treatment plan.

According to Dr. Hoffmann, Doughty did not complain of right knee pain at his appointment on April 15, 2020, although Doughty disputes this.  On April 21, 2020, Doughty also wrote a letter to the unit HSM, complaining of pain in his lower back and right knee, which he again attributed to his leg-length discrepancy.  The HSM responded that Dr. Hoffmann was the primary care physician monitoring his chronic pain.  The HSM also advised Doughty that his appointment with the offsite specialist at Winkley was on

hold due to the COVID-19 pandemic.

Throughout the remainder of 2020 and beyond, both onsite and offsite medical appointments for DOC inmates were kept to a minimum due to the pandemic. As a result, emergent situations or conditions that required immediate attention were given priority, while inmates with chronic conditions that did not have emergency needs were only seen at face-to-face appointments with medical staff on a limited basis to avoid spreading COVID-19 throughout the institution.

On May 14, Doughty submitted an HSR, advising the prescription for Celebrex helped alleviate some pain in his joints, was not helping the "constant pain" in his back and knee. Because Doughty reported having some relief with Celebrex and reported an upset stomach from other NSAIDs, Dr. Hoffmann elected to continue Doughty's prescription for Celebrex, which he had been taking for only a month, to determine the medication's effectiveness in the long term. Because narcotics are not appropriate for musculoskeletal conditions and are highly addictive (and sought-after in the institutional setting), Dr. Hoffmann avers that he specifically declined to switch Doughty's pain medication to a narcotic at that time.

On May 25, Doughty wrote a letter to the HSM, complaining that his back and knee pain were being ignored. Doughty also blamed his chronic pain on the leg length discrepancy caused by his "botched hip replacement" surgery. Doughty further stated that he did not agree with Dr. Hoffmann's treatment plan and asserted that he needed x-rays, MRIs, more cushioned shoes, gel insoles, and a mattress. The HSM responded that Doughty was not yet due to return for a follow up appointment with the orthopedic

6

specialist for symptoms related to his surgery, but that Dr. Hoffmann would schedule an appointment with the orthopedic specialist if he felt it was necessary. In the meantime, the HSM encouraged Doughty to continue with the course of treatment prescribed by Dr. Hoffmann and to communicate clearly about his concerns at his next appointment.

In June, Doughty wrote another letter to the HSM, explaining that he did not wish to go to the appointment that Dr. Hoffmann ordered for him with the offsite specialist at Winkley. Due to the COVID-19 pandemic, inmates who went offsite were required to quarantine for a minimum of two weeks, and Doughty declined the appointment with the offsite specialist because he did not wish to quarantine at that time. Doughty later changed his mind, however, and on September 2, he visited the offsite specialist at Winkley. That specialist determined that Doughty needed new orthopedic shoes with a one-inch lift in the right shoe.

On September 15, Doughty had another appointment with Dr. Hoffmann to address his complaints of back pain, issues with his shoes, and his lab results. Doughty contends that he advised Dr. Hoffmann during this meeting that he was experiencing a great deal of pain in his back and right knee. According to medical records from this appointment, however, Doughty was optimistic that the new orthopedic shoes from the offsite specialist would help alleviate his knee and back pain. Accordingly, Dr. Hoffmann ordered a follow-up appointment in five months.

Dr. Hoffmann saw Doughty again on February 25, 2021. At this appointment, Doughty reported that he was able to move better since receiving his new orthopedic shoes from the offsite specialist at Winkley. While heavy, Doughty also reported that the shoes

were more comfortable.  Although Doughty states that he "mentioned his knee pain" during the appointment, Dr. Hoffmann avers that Doughty did not report any worsening knee pain and his physical examination was normal.  Because Dr. Hoffmann believed that Doughty's knee pain had improved, he did not order any imaging, but he did order additional lab tests and scheduled another follow-up appointment in seven months.

### C.  Plaintiff's Subsequent Treatment

Doughty had no further appointments with Dr. Hoffmann, who retired from state service in April 2021.  In December 2021, Doughty saw another physician, Dr. Daughtry, who examined Doughty's back and right knee.  Dr. Daughtry observed that Doughty's right knee was "tender laterally" but there was no swelling.  He ordered physical therapy and x-rays for Doughty's back and knee.  Those x-rays revealed arthritis, but nothing more serious.  After six visits with the physical therapist did not help, Doughty returned to see Dr. Daughtry on February 23, 2022.  At this point, Dr. Daughtry ordered an MRI for Doughty's right knee.  The results of the MRI revealed tears in Doughty's menisci and ACL, as well as severe arthritis in the joint, and Doughty was told that he would need a total knee replacement.

OPINION

Doughty filed this lawsuit in 2023, alleging that Dr. Hoffmann consciously disregarded a serious medical need and was negligent for failing to treat his complaints of right knee pain correctly.  Doughty's primary claim is that Dr. Hoffmann treated his right knee based on diagnoses made by specialists regarding his leg length discrepancy without

ordering imaging of his knee.  The court granted Doughty leave to proceed with claims that Dr. Hoffmann acted with deliberate indifference to his knee pain in violation of the Eighth Amendment and was negligent under state law.

Dr. Hoffmann now moves for summary judgment on all of Doughty's claims, arguing that:  (1) Doughty has not established that the level of care provided violated the Constitution; and (2) alternatively, he is entitled to qualified immunity because he did not violate clearly established law in relying on the diagnoses made by medical specialists.  Dr. Hoffmann argues further that Doughty cannot establish a state law claim for negligence because he does not provide expert testimony about the standard of care, or alternatively, that the court should relinquish supplemental jurisdiction over this claim.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To survive summary judgment, the nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to [reach] a verdict in [his] favor." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (citation and internal quotation marks omitted).

While the court views the record "in the light most favorable to the nonmovant and constru[es] all reasonable inferences from the evidence in his favor," *Moore v. Western Ill. Corr. Ctr.*, 89 F.4th 582, 590 (7th Cir. 2023), the nonmovant is only entitled to favorable

inferences that are supported by admissible evidence, not those based upon mere speculation or conjecture, *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017), or upon "[c]onclusory statements, not grounded in specific facts," *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016). The court will address Doughty's Eighth Amendment claims under this standard before turning to his state-law negligence claims.

**I. Eighth Amendment Claims**

The Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners" that amounts to "the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To succeed on a claim of constitutionally inadequate medical care, an inmate "must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)). A medical need is objectively serious if it "has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (citations and internal quotations omitted). A prison official acts with the requisite deliberate indifference only if the official "*actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *see also Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (same).

A court must look at the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728.  Deliberate indifference is "a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)).  In particular, where treatment has been provided, "[a] constitutional violation exists only if no minimally competent professional would have so responded under those circumstances." *Johnson*, 5 F.4th at 825 (citation and internal quotations omitted).  Moreover, a prisoner's dissatisfaction with a doctor's prescribed course of treatment -- as here -- does not give rise to a constitutional claim *unless* the treatment was "so blatantly inappropriate as to evidence intentional mistreatment," *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996), *or* was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."  *Brown*, 38 F.4th at 551 (citations omitted).  Otherwise, medical professionals are entitled to "a great deal of deference in their treatment decisions." *Johnson*, 5 F.4th at 825 (citation and internal quotations omitted).

Doughty claims that Dr. Hoffmann acted with deliberate indifference to his complaints of right knee pain by examining him for intermittent claudication at his initial appointment on January 15, 2020, instead of conducting a more extensive physical examination and ordering imaging.  (Dkt. #2, at 1; Dkt. #35, at 5.)  In response, Dr. Hoffmann explains that he examined Doughty for intermittent claudication because he

reported experiencing knee and back pain after walking more than 10 minutes.  (Hoffmann Decl. (dkt. #31) ¶ 37.)  Dr. Hoffmann also notes that lower extremity pain is a symptom of intermittent claudication that can signal arterial disease, which can be a limb threatening issue.  (*Id*. at ¶ 38.)  After ruling out intermittent claudication, Dr. Hoffmann next considered whether Doughty's knee pain was caused by his leg length discrepancy, which had already been diagnosed by two specialists, and the possibility that using a rigid shoe lift was creating an unnatural walking pattern that was putting strain on his right knee. (*Id*. at ¶¶ 41-42.)   Because leg length discrepancy can often cause knee pain of the sort that Doughty reported, Dr. Hoffmann then developed a treatment plan that included a change of pain medication, a physical therapy consultation for an evaluation of Doughty's condition, lab tests, and a return visit in three months.  (*Id*. at ¶¶ 43-48.)  At a follow-up appointment on April 15, 2020, Dr. Hoffmann next evaluated the effectiveness of the treatment plan, then switched Doughty's pain medication from ibuprofen to Celebrex to alleviate Doughty's stomach issues.  (*Id*. at ¶¶ 59-60.)  He also ordered another consult with the offsite specialist at Winkley to address Doughty's complaints that his shoe lift was too hard and heavy.  (*Id*.)

As for Doughty's assertion that Dr. Hoffman should have ordered imaging for his right knee before formulating the treatment plan at his initial appointment on January 15, 2020, Hoffmann explains that he believed imaging was unnecessary at that time because of the specialists' recent assessment.  (Hoffmann Decl. (dkt. #31) ¶ 49.)  More specifically, Dr. Hoffmann explains that it is standard medical practice not to re-diagnose a patient who has already been recently diagnosed by a specialist, especially if the patient reports

symptoms consistent with that diagnosis.  (*Id*. at ¶ 114.)  As a medical professional, Dr. Hoffmann was entitled to defer to the diagnosis made by two, different offsite specialists -- who treated Doughty's previous complaints of knee pain by prescribing orthotics to compensate for the difference in leg length -- unless their diagnoses were clearly wrong. *E.g., Drinkwater v. Larson*, No. 16-cv-134-wmc, 2019 WL 1508965, at \*13 (W.D. Wis. Apr. 5, 2019) (prison health care providers "were entitled to defer to the contemporaneous recommendations of medical specialists"), aff'd, 794 F. App'x 523 (7th Cir. 2020).  Thus, Dr. Hoffmann's decision to defer to the diagnosis and treatment provided by the specialists reflects professional judgment, not deliberate indifference, or at least a reasonable jury would have to find absent evidence to the contrary.  *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").  While Doughty would point to a later determination of other causes of his knee pain, a jury would be engaging in prohibited application of hindsight in considering those facts.

Doughty also argues that Dr. Hoffmann should have ordered imaging at his follow-up appointments on September 15, 2020, and February 25, 2021, to determine why Doughty's right knee pain persisted despite the orthotics that he had received from the offsite specialist at Winkley.  (Dkt. #35, at 5, 13.)  However, Dr. Hoffmann credibly explains that he did not believe imaging was necessary at the September 15, 2020, appointment because Doughty had just been seen by the specialist at Winkley, who the undisputed evidence shows, also believed that his new orthopedic shoes would improve his

symptoms.  (Hoffmann Decl. (dkt. #31) ¶ 92.)  Finally, Dr. Hoffmann did not believe that imaging was necessary at his last appointment with Doughty on February 25, 2021, because in his opinion "Doughty was doing better after he had received his shoes and running further diagnostic testing without notable reason is unnecessary." (*Id*. at ¶ 101.)

The United States Supreme Court has emphasized that "medical judgment" includes decisions about whether x-rays or additional diagnostic techniques or forms of treatment are indicated. *Estelle*, 429 U.S. at 107.  Because Dr. Hoffmann's treatment decisions were indisputably based on the exercise of medical judgment, Doughty has not demonstrated a rational basis for a lay jury to find the requisite deliberate indifference.  *Id*. In contrast, Doughty's *own* disagreement with Dr. Hoffmann's decisions, without more, is not enough to create a triable Eighth Amendment issue. *Cesal v. Moats*, 851 F.3d 714, 722 (7th Cir. 2017) ("'[M]ere disagreement with a doctor's medical judgment' is not enough to support an Eighth Amendment violation.") (quoting *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010)).  Importantly, even assuming that Dr. Daughtry's decision was mistaken, mere negligence or medical malpractice -- and the evidence of that is weak at best, since it, too, depends on a hindsight inference from Dr. Hoffman's later decision to pursue x-rays and physical therapy of the knee, before even later ordering an MRI -- is not sufficient to establish deliberate indifference.  *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Indeed, the record shows that Doughty *himself* attributed his knee pain to the leg length discrepancy in his letter to the HSM in December 2019, *and* during his initial

14

appointment with Dr. Hoffmann on January 15, 2020.  (Dkt. #32-1, at 25-26, 62-65.)

Accordingly, Dr. Hoffmann developed a treatment plan that included pain medication,

physical therapy and lab tests, as well as a referral back to the offsite specialist at Winkley,

who had diagnosed the leg-length discrepancy and prescribed new orthopedic shoes in

September 2020.  (*Id.* at 23-29, 51-52.)   Doughty also received gel insoles that were

recommended by Dr. Hoffmann while he was awaiting his appointment at Winkley, which

was delayed by the pandemic *and* Doughty's own decision to defer the appointment to

avoid quarantine.  (*Id.* at 14-15, 46, 57.)  On this record, Doughty has neither shown nor

could a reasonable jury find that Dr. Hoffmann's treatment plan was blatantly

inappropriate such that no minimally competent professional would have responded

similarly under the circumstances.  *Johnson*, 5 F.4th at 825.  As a result, Dr. Hoffmann's

treatment decisions based on medical judgment are entitled to deference and do not

constitute deliberate indifference as a matter of law.  *Id.*; *see also Snipes*, 95 F.3d at 591

("Medical decisions that may be characterized as 'classic example[s] of matter[s] for

medical judgment,' *Estelle*, 429 U.S. at 107, such as whether one course of treatment is

preferable to another, are beyond the [Eighth] Amendment's purview.").

In fairness, Doughty argues further that Dr. Hoffmann's treatment plan prolonged

his pain and delayed him from receiving the diagnosis made by Dr. Daughtry in 2022, after

an MRI showed that he had tears in his menisci and ACL.  (Dkt. #35, at 17-18.)  Moreover,

an "inexplicable delay" that exacerbates a prisoner's medical condition or unnecessarily

prolongs suffering can show deliberate indifference.  *Goodloe v. Sood*, 947 F.3d 1026, 1031

(7th Cir. 2020).  However, in circumstances where medical care is delayed, the Seventh

Circuit has "required that the plaintiff present 'verifying medical evidence' that the delay, and not the underlying condition, caused some harm." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (quoting *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013)); *Petties*, 836 F.3d at 730-31 (a delay in treatment only constitutes deliberate indifference where a plaintiff presents independent evidence that the delay exacerbated an injury).

Here, the undisputed record shows that Dr. Hoffmann did not delay referring Doughty for an MRI. Dr. Hoffmann determined that imaging was not necessary in the exercise of his professional judgment, and importantly, specialists at Winkley also prescribed a different course of treatment, including varied pain medications in the hope that any temporary discomfort caused by the untreated leg-length discrepancy might lessen. In fact, as Hoffmann points out, even Dr. Daughtry, who treated Doughty after Hoffmann retired, *also declined* to refer him for an MRI right away, referring Doughty first for an x-ray followed by a course of physical therapy. For all the reasons discussed above, therefore, Doughty does not show that Dr. Hoffmann's treatment decisions rose to the level of deliberate indifference.

Moreover, Doughty presents no evidence showing that tears in his menisci or ACL were present when Dr. Hoffmann treated him for the last time on February 25, 2021, or at any other previous time. Neither do the available medical records support Doughty's argument that his condition *worsened* under Dr. Hoffmann's care. As Dr. Hoffmann correctly notes, the medical records reflect that Doughty's lipid profile improved between the appointment on September 15, 2020, and his final appointment with Doughty on

16

February 25, 2021, showing he was able to walk better and exercise more after receiving new orthopedic shoes from the specialist at Winkley and pain medications from Hoffman. (Hoffman Decl. (dkt. #31) ¶¶ 84, 86-87, 94, 96; Dkt. #32-1, at 22-24.)  As a result, Doughty does not show that Dr. Hoffmann's chosen course of treatment caused Doughty's condition to deteriorate.

Indeed, when considered against the overall treatment plan implemented by Dr. Hoffmann, *no* reasonable jury could find that Dr. Hoffmann's chosen course of treatment departed radically from accepted professional practice or was not based on professional judgment.  *Zaya*, 836 F.3d at 805.  Doughty also does not show that Dr. Hoffmann "doggedly persist[ted] in a course of treatment known to be ineffective," *Goodloe*, 947 F.3d at 1031, nor that his actions were "blatantly inappropriate."  *Snipes*, 95 F.3d at 592. Because no reasonable jury could conclude that Dr. Hoffmann was deliberately indifferent to plaintiff's complaints of knee pain, he is entitled to summary judgment on plaintiff's Eighth Amendment claims against him.[4]

## II.     Exercise of Supplemental Jurisdiction over Plaintiff's State-Law Negligence Claim

Because Doughty's federal claim is being dismissed, the sole remaining claim is his allegation that Dr. Hoffmann was negligent or committed medical malpractice for failing to properly treat his complaints of knee pain.  Dr. Hoffmann asks that the court relinquish jurisdiction of Doughty's supplemental state-law claim of negligence against him or

---

[4] Absent a constitutional violation, the court need not address Dr. Hoffmann's alternate contention that he is entitled to qualified immunity.

conclude that his claim fails for lack of expert testimony establishing the appropriate standard of care.  (Dkt. #29, at 15-17.)  Since the general rule is that federal courts should relinquish jurisdiction over state law claims if all federal claims are resolved before trial, 28 U.S.C. § 1367(c)(3); *Burritt v. Ditlefson*, 807 F.3d 239, 252 (7th Cir. 2015); *see also Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999), and this court is dismissing Doughty's federal claim against Dr. Hoffmann, the court will decline to exercise supplemental jurisdiction over his state law claim.  Subject to the applicable Wisconsin statute of limitations, therefore, Doughty may pursue his negligence claim in state court.

ORDER

IT IS ORDERED that:

1) Defendant's motion for summary judgment (dkt. #28) is GRANTED and judgment shall be entered against plaintiff Matthew T. Doughty on his Eighth Amendment claims.

2) The court relinquishes jurisdiction over plaintiff's state-law claims, which are dismissed without prejudice.

3) The clerk of court is directed to enter final judgment accordingly and close this case.

Entered this 25th day of June, 2024.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge